**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **WEST AMERICAN INS. CO.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **REQUEST FOR** |
| | ) | **ORAL ARGUMENTS** |
| **v.** | ) | **2:05-CV-1125-B** |
| | ) | |
| **ASPHALT PAVING CO., INC. and** | ) | |
| **EASTDALE MALL, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**RESPONSE OF ASPHALT PAVING CO., INC. TO**
**WEST AMERICAN INSURANCE COMPANY'S**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant, Asphalt Paving Company, Inc. ("Asphalt Paving"), files this Response to Plaintiff's Brief in Support of Motion for Summary Judgment.

**I.     CASE OVERVIEW AND BURDEN OF PROOF**

The insurer, West American Insurance Company (hereinafter "Plaintiff" or "West American"), has employed a variety of arguments in support of its smoke and mirrors performance designed to avoid coverage.  West American has gone to great lengths to place its insured, Asphalt Paving, in a precarious situation when it deliberately filed its Motion *over three months* in advance of this Court's Scheduling Order Cut-off date and *just weeks* before the trial of the underlying case. This gamesmanship by West American is egregious and tantamount to bad faith.

The Motion, filed by West American, is simply posturing.  West American is attempting to force its insured into a situation where it is required to "pony up" money to settle the underlying case to avoid having a large verdict entered against it.  It is

unbelievable to Asphalt Paving (the insured), that its insurer (West American), will not live up to its obligations, as Asphalt Paving has timely paid all of the premiums and West American has accepted those premiums.   Moreover, a cursory review of the brief filed by West American reaffirms that that insurer is posturing, as it has not even tried to meet its burden of proof.  As shown below, West American has not met its burden of proof.

## II.     STATEMENT OF UNDISPUTED FACTS -   UNDERLYING CASE

### (A)     Overlaying and Re-Striping the Eastdale Mall Parking Lot.

#### (i)     Contacting the Defendants.

In the spring of 2004, Eastdale Mall began the expansion of the Mall facilities. (Affidavit of McLaughlin).  As part of the expansion, in late 2004, Eastdale Mall, LLC ("Eastdale Mall") contacted Asphalt Paving Company, Inc. ("Asphalt Paving") about overlaying and re-striping the Mall parking lot to the original layout. (Affidavit of McLaughlin).   Soon thereafter, Asphalt Paving contacted Tri-State Parking Lot Maintenance, LLC ("Tri-State") requesting a "Proposal and Contract" for re-striping the Mall parking lot to the original layout. (Exhibit A; Depo. of Hurst, pp. 15, 29-30, ("This time I had to layout what was on the ground and re-stripe it."); Depo. of Hurst, p. 50 ("I was told to put the striping back down on the ground like it was.").

#### (ii)     Tri-State submits its Proposal and Contract to Asphalt Paving.

In September of 2004, in response to Asphalt Paving's request, Tri-State submitted its Proposal and Contract for the re-striping work to Asphalt Paving. (Exhibit A). In submitting its Proposal and Contract to Asphalt Paving, Tri-State did not inspect the Mall parking lot, i.e., count the parking spaces.  (Depo. of Hurst, pp. 23-28).  Rather, Tri-State relied upon documents located in its files to create the Proposal and Contract

amount, since it had previously performed re-striping work at the Mall.  (Depo. of Hurst, pp. 23 – 28).  The information upon which Tri-State relied to create its Proposal and Contract showed the Mall parking lot to have 4476 parking spaces in addition to 75 handicap parking spaces.  (Depo. of Hurst, p. 24; Exhibit B).

> ### (iii)    Asphalt Paving submits its "Proposal Contract" to Eastdale Mall.

On or about October 18, 2004, Eastdale Mall received a document titled "Proposal Contract" ("Contract") from Asphalt Paving for the asphalt overlay and re-striping work at the Mall.[1]  (Exhibit C).  In addition to other specifications, the Contract contained the following language:

> **Overlay Parking Lot …**

> **Stripe Original Layout …**

(Exhibit B; Depo. of Hall, p. 11).  An integral part of the Contract was the requirement that the parking lot be re-striped to the original layout, except for certain changed areas surrounding the JC Penney's building.[2]  (Exhibit B; Depo. of Hall, p. 11; Depo. of Forbus, p. 31).

> ### (iv)    Defendants only measured a couple of parking space prior to overlaying the parking lot with asphalt.

Prior to beginning the job, Asphalt Paving and Tri-State (together) measured no more than  a couple of parking space.  (Depo. of Hall, pp. 12-13; Depo. of Hurst, pp. 34-35, 54-55).   Mr. Hall, general manager of Asphalt Paving, testified as follows:

---

1    The Defendants began the asphalt overlaying and re-striping process after October 18, 2004. (Affidavit of McLaughlin).

2    As set forth infra, a site plan was provided to both Tri-State and Asphalt Paving prior to either party beginning work at the Mall.  (Depo. of Hurst, pp. 33, 39; Depo. of Hall, pp. 28-29, 34-35; Depo. of Forbus, p. 19).   Additionally, Asphalt Paving agreed to perform the re-asphalting and re-striping work in all areas shown on the site plan, including the changed areas surrounding the J.C. Penney's building. (Depo. of Forbus, p. 29).

> Q:      How many spaces did [Tri-State] measure?
>
> A:      [Tri-State] measured the one.  I said, let's make sure you stripe it back to the original layout.  And he said he would and measured the first one…

(Depo. of Hall, pp. 12-13).

### (v)     Asphalt Paving and Tri-State received a site plan that showed the original layout of the parking lot.

At the beginning of the job, both Asphalt Paving and Tri-States received a site plan which showed, in detail, the exact number of parking spaces then on the ground at the Mall as well as the location of each parking spaces.  (Depo. of Forbus, p. 19; Depo. of Hurst, pp. 33, 39; Depo. of Hall, pp. 28-29, 34-35).  The site plan also showed the areas of the parking lot that had changed due to the construction of the JC Penney's building.  (Exhibit C; Depo. of Forbus, p. 19; Depo. of Hurst, pp. 33, 39; Depo. of Hall, pp. 28-29, 34-35).[3] Mr. Hall, general manager of Asphalt Paving, testified as follows:

> Q:      Let me ask you this:  When you met with Kevin [McLaughlin], did he tell you to put every one of them back just like they were?  Or did he tell you that there was one area that wasn't just like that?
>
> A:      It was one area that was a new layout.
>
> Q:      Okay.  All right.  Where was that?
>
> A:      It was around the JC Penney construction area.
>
> Q:      Okay.  And were you given any documents?
>
> A:      Yes.
>
> Q:      What documents were you given?
>
> A:      Just prior to starting, we were given a [site plan].

---

3       The site plan, prepared by Columbia Engineering, depicts the original layout of the parking lot and the modifications to the parking lot surrounding the JC Penney's building. (Affidavit of Young).

(Depo. of Hall, p. 13).

> Q:     The question I asked you was: Before you started your work, did you read the [site] plan that you were given?
>
> A:     I took the [site] plan, did not look at the striping detail.

(Depo. of Hall, p. 55).

> Q:     …Did you expect Tri-State – when you gave them the [site] plans …, did you expect Tri-State to look at the parking details on those plans?
>
> A:     No.
>
> Q:     Okay.  So as the supervisor – you were the supervisor of this whole project, right?
>
> A:     Yes.
>
> Q:     And as the supervisor having been given a plan, you did not expect Tri-State, your subcontractor, to even look at the parking layout that was given to you by the owner; is that correct?  Is what I said correct?
>
> A:     Correct.

(Depo. of Hall, pp. 55-56).

**(vi)    During the re-striping process, Defendants did not use the site plans provided to them.**

During the re-striping process, Tri-State looked at the site plan; however, it did not follow the specifications contained on the plan.  (Depo. of Hurst, pp. 37-38).

Mr. Hurst testified as follows:

> Q:     And are you saying that despite the fact that you were given a layout showing all the parking spaces that you never looked at what Goodwin, Mills and Caywood said the width of the parking spaces was?
>
> A:     That is correct.

(Depo. of Hurst, pp. 45-46).

> Q:    …[W]hy did you – if it didn't have anything to do with where Asphalt Paving was going to be doing its work, why did you understand someone would give you a plan that had the parking layout with the measurements there showing where all the spaces and the number of spaces were and you were going to do the restriping?  Why did you imagine they gave you that plan?
>
> A:    I don't have any idea.
>
> Q:    Okay.  You just thought they were just giving it to you, is that correct?  No purpose that you knew anything about; is that right?  That's you testimony?
>
> A:    Yes.

(Depo. of Hurst, p. 48).  Moreover, at Mr. Hurst's deposition, he examined the site plan and testified that the site plan did in fact indicate the parking lot layout and the width of the parking spaces.  (Depo. of Hurst, pp. 51-52).  However, Tri-State did not use the site plan during the re-striping process.  (Depo. of Hurst, pp. 50-51).

At the conclusion of the overlay/striping project, the civil engineer over the project performed a punch list.  (Affidavit of Young).  As set out in the punch list, it was determined that the width of the re-striped parking spaces was not the same as was shown on the site plan.  (Affidavit of Young).  Specifically, prior to the asphalt overlay, the width of the parking spaces on the ground was 9 feet while the new parking spaces are 10 feet. (Affidavit of Bollinger).

      **(vii)    The undisputed evidence shows that the Defendants provided 382 fewer parking spaces than they were obligated to provide.**

Due to the modifications surrounding the JC Penney's building, the total number of parking spaces required to be re-striped by the Defendants was 4305. (Affidavit of Young; Corrected Affidavit of McLaughlin; Corrected Affidavit of Lambert).[4] Defendants only re-striped 3726 parking spaces. (Affidavit of McLaughlin). Therefore, the Mall parking lot has 382 fewer parking spaces then the number Defendants were obligated to provide. (Affidavit of Young; Affidavit of Lambert; Affidavit of McLaughlin).

Mr. Hall testified as follows:

> Q:    This is my question, too. Do you agree that the spaces that were restriped – the number of spaces after the restriping were less than the number of spaces shown on the plan you were given?
>
> A:    Yes.

(Depo. of Hall, p. 52); see also, (Depo. of Hurst, p. 41).

      **(viii)    The Importance of Re-Striping the Parking Lot to the Original Layout.**

Mr. Forbus, president/owner of Asphalt Paving, testified that he was fully aware (at all relevant times) that it was important to stripe the correct number of parking spaces in a Mall parking lot. (Depo. of Forbus, pp. 7, 8). Mr. Forbus also testified that due to the importance of striping the correct number of parking spaces and the contractual obligations between the Mall owner and its tenants related to having the correct number of parking spaces, "the standard of good practice would suggest that [he] read the plans"

---

[4]    Dubose Construction Company striped 195 of the 197 it was required to re-stripe. (Corrected Affidavit of McLaughlin)

given to him.  (Depo. of Forbus, p. 15).    Mr. Forbus also testified that even if he was provided a site plan showing the number of parking spaces, he would also physically count each space prior to bidding on the project. (Depo. of Forbus, p. 19). In the present case, neither Asphalt Paving nor Tri-State counted each parking space prior to re-asphalting the parking lot, nor did they use the site plans to determine the correct location and number of parking spaces to re-striped.  (Depo. of Forbus, pp. 13, 14, 19; Depo. of Hall, pp. 12-13; Depo. of Hurst, pp. 34-35, 54-55).

> **(ix)    Standard of Care for Overlaying and Re-Striping to the Original Layout.**

When re-striping a parking lot to its original layout, a general contractor and its subcontractor should use (and are expected to use) a site plan to ensure that the parking lot is correctly re-striped.  (Affidavit of Alexander).  Prior to re-asphalting a parking lot, a general contractor and subcontractor should review the site plan.    (Affidavit of Alexander).  Should a general contractor and/or its subcontractor encounter a difference between what is shown on the site plan and what is present on the ground prior to re-asphalting, a contractor and/or its subcontractor should make the appropriate inquiries prior to proceeding with re-asphalting.  (Affidavit of Alexander).

Alternatively, should a site plan not be available to the general contractor or its subcontractor, contractors (general and subcontractors) should, prior to re-asphalting, prepare a drawing of the parking lot which should reflect the number and location of the existing parking.  (Affidavit of Alexander).  The contractor should count each of parking spaces prior to re-asphalting the parking lot.  (Affidavit of Alexander).  This drawing should reflect each parking space present on the ground prior to re-asphalting.  (Affidavit of Alexander).

In the present case, although neither Asphalt Paving nor Tri-State used the site plan in their possession to determine the number and location of the parking spaces, they also did not prepare a drawing which accurately reflected the original layout of the parking lot prior to re-asphalting.

**(x)     Asphalt Paving's Duties to Eastdale Mall.**

The duty owed by Asphalt Paving to Eastdale Mall was a duty to exercise reasonable care to re-stripe the Mall parking lot to its original layout. Specifically, in accordance with industry standards, Asphalt Paving owed Eastdale Mall the duty to use the site plan during the re-striping process to insure that the correct number of parking spaces were striped and were striped in the correct location. Alternatively, had a site plan not existed prior to the re-asphalting, Asphalt Paving owed a duty to Eastdale Mall to count each parking space and prepare a drawing reflecting those parking spaces prior to re-asphalting the parking lot. Separate and apart from those duties, Asphalt Paving owed Eastdale Mall a duty to exercise reasonable care in the performance of its contractual duties.

**(xi)     Tri-State's Duties to Eastdale Mall.**

Like Asphalt Paving, Tri-State also owed Eastdale a duty to exercise reasonable care to re-stripe the Mall parking lot to its original layout. Specifically, in accordance with industry standards, Tri-State owed Eastdale Mall a duty to use the site plan during the re-striping process to ensure that the correct number of parking spaces were striped in the correct location. Alternatively, had a site plan not existed prior to the re-asphalting, Tri-State owed a duty to Eastdale Mall to count each parking space and prepare a drawing reflecting those parking spaces prior to re-asphalting the parking lot. Separate

and apart from those duties, Tri-State owed Eastdale Mall a duty to exercise reasonable care in the performance of its contractual duties.

### (xii)    Eastdale Mall Has Alleged That Each Defendant Breached Its Respective Duties To Eastdale Mall.

As set out in the Statement of Undisputed Material Facts, both Asphalt Paving and Tri-State, breached its respective duties to Eastdale Mall when they did not re-stripe the parking lot to the original layout; did not accurately count the parking spaces in accordance with industry standards; did not properly prepare a drawing of the parking lot in accordance with industry standards; and did not follow the site plan in accordance with industry standards.

### (xiii)    Eastdale Mall Has Alleged That The Defendants' Breach of Their Respective Duties Proximately Caused Damage To Eastdale Mall Beyond The Cost Of Repairing Or Re-doing The Asphalt.

Eastdale Mall, in the underlying case, has presented substantial evidence that both Asphalt Paving and Tri-State's breach of the applicable industry standard of care for re-striping a parking lot to the original layout and their negligent performance of their respective contractual obligation caused Eastdale Mall damage.

### (xiv)    Eastdale Mall has been damaged by Defendants' breach of duty.

Eastdale Mall paid for the work performed by Asphalt Paving and Tri-State. (Depo. of Hall, 28). However, as a result of their negligence, and even wantonnesss, provided 382 fewer parking spaces than they were obligated to provide. (Affidavit of McLaughlin). Because of the shortage, Eastdale Mall is in breach of several of its leases with tenants at the Mall. (Affidavit of McLaughlin; Affidavit of Aronov). Moreover, customers have been inconvenienced. (Affidavit of McLaughlin; Affidavit of Aronov).

Correcting the striping problem will cost $820,000 today and the cost will only increase over time. (Affidavit of McLaughlin).   Moreover, as stated by Mr. Aronov, "… the value of the shopping center is thereby diminished by several million dollars" due to the negligence, and even wantonness, of Asphalt Paving and Tri-State.   (Affidavit of Aronov).

## III.    ARGUMENT

As set forth below, the arguments presented by the insurer, West American, are without merit and coverage should, therefore, be afforded to Asphalt Paving for the claims asserted by Eastdale Mall.

### A.    Insurance Contracts Must Be Construed in Light of the Reasonable Expectations of the Insured.

Insurance policies should be construed as they would be understood by a reasonable person in the position of the insured. Aenta Casualty & Surety Co. v. Chapman, 240 Ala. 599, 200 So. 425 (1941).  The test of coverage is not what the insurer intended to cover, but what a reasonable person in the position of the insured would have understood to be covered.  Guaranty National Insurance Co. v.  Marshall County Board of Education, 540 So.2d 745 (Ala. 1989)(the reasonable expectation doctrine provided coverage where there was none in the four corners of the policy).  This is sometime referred to as the "reasonable expectations" doctrine.  Id.

The reasonable expectations doctrine reflects the reality that insurance policies are contracts of adhesion written by insurance companies for their own benefit.  As noted by the Seventh Circuit: "Torn between the desire to use common form, which ought to lead to consistent results, and the need to tailor coverage to particular situations, the insurance

11

industry often ends up with policies that are, to put it charitably, convoluted." <u>Prisco Serena Sturm Architects, Lts. v. Liberty Mut. Ins. Co.</u>, 126 F.3d 886, 887 (7th Cir. 1997).

The complex nature of insurance policies has led most states, including Alabama, to adopt rules requiring that policies be construed in the light most favorable to a finding of coverage. Policies should be construed consistent with the reasonable expectations of the insured so that "people who reasonably think they have insured themselves are not unpleasantly surprised when they submit a claim." <u>Prisco Serena Sturm Architects, Lts. v. Liberty Mut. Ins. Co.</u>, 126 F.3d 886, 888 (7th Cir. 1997).

Policy exclusions should be strictly construed against the insurer, particularly where they are of uncertain import or reasonably susceptible to more than one construction, or where they negate coverage provided elsewhere in the policy. <u>Guaranty Nat'l Ins. Co. v. Marshall County Bd. of Educ.</u>, 540 So.2d 745, 748 (Ala.1989)(When "ambiguity exists in the language of an exclusion, the exclusion will be construed narrowly so as to limit the exclusion to the narrowest application reasonable under the wording.").  A policy should be considered as a whole to give reasonable meaning to every provision. <u>National Union Fire Ins. Co. v. City of Leeds</u>, 530 So.2d 205, 207 (Ala.1988)(In construing the language of an insurance policy, the language should be given the meaning that a person of ordinary intelligence would reasonably think the language had).  In this way, the reasonable expectations of the insured as to coverage can be ascertained and respected.

As described below, the policy as a whole gives Asphalt Paving a reasonable expectation of coverage for Eastdale Mall's claims.

**B.      Asphalt Paving Reasonably Expected That Its Policy Covered Eastdale Mall's Claims, As Coverage Is Not Excluded In The "Damage To Your Work" Exclusion.**

The West American insurance policy covers a subcontractor's negligence.  West American, in its brief, argues that the "Damage To Your Work" provision excludes coverage for the claims and damages asserted by Eastdale Mall. West American fails to focus on the following section of "Damage To Your Work" provision:

> This exclusion **DOES NOT APPLY** if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(West American Policy, Page 5 of 14).  In light of the above subcontractor exception to the exclusion, Asphalt Paving reasonably expected that Eastdale Mall's claims would be covered, as it is undisputed that Tri-State negligently (and wantonly) striped the asphalt. This exception clearly demonstrates the intent of West American to cover damages arising from a subcontractor's negligence. This subcontractor exception, therefore, affords coverage to Asphalt Paving for the claims and damages asserted by Eastdale Mall.

**C.      The Term "Occurrence" In the Insuring Clause Of The CGL Policy Embraces Claims For Property Damage As Alleged By Eastdale Mall.**

The underlying complaint in Eastdale Mall, LLC v. Asphalt Paving Co., Inc., Civil Action Number CV-2005-1391 contains three causes of action: (i) negligent and wanton hiring and supervision; (ii) negligent and wanton performance of the work; and, (iii) breach of contract.   The insuring clause in CGL policy states as follows:

> a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damages" to which this

insurance applied.  We will have the right and duty
to defend and "suit" seeking those damages…

b.    This insurance applied to "bodily injury" and
"property damage" only if:

(1)    The "bodily injury" or "property damage" is
caused by an "occurrence" that takes place
in the "coverage territory;"

An "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (West American Policy).  The classic definition of "accident" is that it is an unexpected, untoward event that happens without intention or design.  Ketona Chems. Corp v. Globe Indem. Co., 404 F.2d 181 (5th Cir. 1968).  However, Alabama Courts have not put such a restrictive interpretation on the definition of an "accident", saying that the term does not exclude forms of human fault, such as negligence.  USF&G v. Bonitz Insulation Co. of Ala., 424 So.2d 569 (Ala. 1982)("We have previously held that the term 'accident' does not necessarily exclude human fault called negligence … As Bonitz is merely charged with negligence in installing the roof, there is no evidence that they expected or intended the roof to start leaking."); USF&G v. National Tank & Mach. Works, Inc., 402 So.2d 925 (Ala. 1981)(negligent or wanton delivery of wrong product required a defense for an "occurrence").  Finally, "property damage" is defined to mean:

a.    Physical injury to tangible property,
including all resulting loss of use of that
property.  All such loss of use shall be
deemed to occur at the time of the physical
injury that caused it; or

b.    Loss of use of tangible property that is not
physically injured.  All such loss of use shall

be deemed to occur at the time of the "occurrence" that caused it.

For reasons discussed below, the claims asserted by Eastdale Mall constitute an "occurrence" under CGL policy.

> **(i)    Negligent and/or wanton hiring and supervision is an "occurrence".**

The alleged "negligent hiring and supervision" claim asserted by Eastdale Mall arising out of the striping work performed by Tri-State for Asphalt Paving constitutes an occurrence under the West American Policy. In <u>Capital Alliance Insurance Company v. Thorough-Clean, Inc.</u>, 639 So.2d 1349 (Ala. 1994), the Supreme Court held that a claim for negligent hiring and supervision was <u>not</u> excluded from a Commercial general liability policy stating: "Capital Alliance is obligated to defend and provide coverage benefits to its insured, Thorough-Clean, as a result of the claim of negligent hiring and supervision asserted against it." <u>Id</u>. at 1352. Accordingly, Plaintiff's Motion for Summary Judgment is due to be denied as negligent hiring and supervision is a covered claim under the West American policy.

> **(ii)    The alleged negligence (and wantonness) of Asphalt Paving and Tri-State constitutes an "occurrence".**

The alleged negligence of Asphalt Paving and/or Tri-State Striping in re-striping the asphalt is an occurrence under the West American Policy. <u>USF&G v. National Tank & Mach Works, Inc.</u>, 402 So.2d 925 (Ala. 1981)(negligent or wanton delivery of wrong product required a defense for an "occurrence"). In <u>Acceptance Insurance Company v. Brown,</u> 832 So.2d 1 (Ala. 2001), the plaintiff alleged that defendants negligently and/or wantonly injured the plaintiff by shooting and beating him without provocation, justification, or legitimate excuse. The defendant insurance company sought to deny both

coverage and its duty to defend on the basis of the assault and battery exception in the policy. However, the Supreme Court said:

> "Because Gloria's statement to Smith provides support for the contention that Scott's injuries arose out of negligent or wanton conduct on the part of Gloria Brown, and thus, that her claims were arguably within the policy's coverage." The trial court properly submitted the jury issue whether Acceptance breached its contract of insurance by refusing to defend her in Scott's action."

In the present case, the Complaint contains allegations that the negligence of Asphalt Paving and Tri-State Striping resulted in there being fewer parking spaces and substantial devaluation and use of the mall. Since the allegations for negligence and wantonness in the Complaint are clearly an occurrence, the insurer has a duty to defend, and indemnify, Asphalt Paving in the underlying case. Accordingly, the Motion for Summary Judgment is due to be denied.

### (iii)    Improper Construction Is An "Occurrence".

Improper construction is an "occurrence" under the West American CGL Policy. This issue was squarely addressed in Massey v. Parker, 733 So.2d 74 (La. App. 1999). In Massey, the Louisiana Court of Appeals stated:

> "Whether there has been an occurrence, however, depends on whether there has been an accident, not upon the legal cause or consequence of that accident. Defective workmanship or the incorporation of defective materials is an accident. With construction defects, the real issue is not whether there has been an occurrence, but whether there has been property damage during the policy, and if so, whether the work exclusion is applicable. If the roof leaks or the wall collapses, the resulting property damage triggers coverage under an occurrence basis policy, even if the sole cause is improper construction and the only damage is for the work performed by the contractor. Whether coverage for an occurrence is excluded by the work, product, or other exception is a separate, very important inquiry. On the other hand, the mere existence of a construction defect does not trigger coverage under an occurrence basis policy; coverage is triggered only if the defect causes property damage during the policy term."

Id. 75-76.

In the present case, the negligent workmanship of Tri-State, which was incorporated into the Asphalt Paving job, constitutes an "occurrence" under the West American CGL Policy.[5]

### D.    The "Damage To Property" Exclusion Does Not Apply.

The "Damage To Property" exclusion does not exclude coverage for the claims and damages asserted by Eastdale Mall in the underlying lawsuit.   The two exclusion provisions cited by West American and the applicable definitional section are as follows:

> "Property damage" to:
>
> **(5)**    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> **(6)**    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> **[Exception]**
>
> Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".
>
> **"Products-completed operations hazard"**
>
> a.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and

---

5    The issue of subcontractor performance was addressed in National Union Fire Insurance of Pittsburg v. Structural Systems Technology, Inc., 964 F.2d 759 (8th Cir. 1992).  In National Union, the court examined whether there was an "occurrence" under the commercial general liability policy when the general contractor's subcontractor supplied and used defective material on the job.  The court held that there was an "occurrence" under the commercial general liability policy due to the fact that the defective condition was created by the workmanship of the subcontractor.

arising out of "your product" or "your work" except…

As an initial matter, exclusion (6) does not apply because the exception to exclusion (6) applies. Specifically, the damages claimed by Eastdale Mall occurred on property which was not owned or rented by the Asphalt Paving arising out of Asphalt Paving's work. As such, the "products-completed operations hazard" applies and renders exclusion (6) a nullity.

Exclusion (5) also does not apply. This exclusion does not apply first because "performing operations" obviously means something different than what Asphalt Paving/Tri-State were doing on the property, and that is a separate exclusion covered in Section B. above. Asphalt Paving/Tri-State were not "performing operations" on the property and, therefore, Exclusion (5) does not apply.

Further, Exclusion (5) does not apply because the injury asserted in the underlying lawsuit is not restricted to the "property damage" to the parking lot; but rather, the Mall complex itself suffered "property damage". More specifically, the evidentiary record, before this Court, shows that the Mall complex has suffered a loss of use, and is less valuable, as a result of the negligence (and wantonness) of Asphalt Paving/Tri-State. It is undisputed that Asphalt Paving was not working "directly or indirectly" in the Mall complex. Asphalt Paving/Tri-State was working solely on the parking lot. Consequently, the damages suffered by the Mall complex, due to the negligence (and wantonness) of Asphalt Paving/Tri-State, are covered under the West American Policy. See, Liberty Mutual Insurance Company v. Wheelwright Trucking Company, Inc., 851 So.2d 466 (Ala. 2002)(court held that insurer owed coverage to insured as a result of the insured loss of use of tangible property that has itself not been

physically injured); Fitness Equipment Co. v. Pennsylvania General Ins. Co., 493 So.2d 1337, 1343 (Ala.1985)(holding that lost profits were covered where the insured's product, a motor used in a treadmill, was defective and caused lost profits on the sale of the treadmills);  United States Fidelity & Guaranty Co. v. Andalusia Ready Mix, Inc., 436 So.2d 868, 871 (Ala.1983)(holding that an insurer was obligated to pay for damages and a loss in value to a water treatment plant caused by the insured's defective product); Truitt Oil & Gas Co. v. Ranger Ins. Co., 231 Ga.App. 89, 498 S.E.2d 572, 573 (1998)(finding coverage where a gasoline leak from an insured's property caused loss of use of other real property);  Haley v. Georgia Farm Bureau Mut. Ins. Co., 166 Ga.App. 596, 305 S.E.2d 160, 162 (1983)(finding coverage for lost profits and other damages caused by the insured's sale of infected swine); USF&G v. Bonitz Insulation Co., 424 So.2d 569 (Ala. 1982)("We think there can be no doubt that, if the occurrence or accident causes damage to some *other* property than the insured's product, the insured's liability for such damage becomes the liability of the insurer under the policy.").  This exclusion, therefore, does not afford Plaintiff the relief it seeks.

### E.    The "Damage To Your Product" Exclusion Does Not Apply.

The "Damage To Product" exclusion does not apply.  The exclusion and applicable definitional section are as follows:

> **Damage to Your Product**
>
> "Property Damage" to "your product" arising out of it or any part of it.
>
> **Your product**
>
> **a.    Means:**

**(1)**    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed by:

**(a)**    You;

As an initial matter, this exclusion is completely irrelevant in that the asphalt, which West American contends is Asphalt Paving's "Product", becomes real property upon its application to the parking lot surface. As such, asphalt does not fall within the definition of "Your product", as it is real property.

Assuming arguendo that this exclusion was relevant, which it is not, in USF&G v. Bonitz Insulation Co., 424 So.2d 569 (Ala. 1982), the Alabama Supreme Court found that the roof installed by the insured was in fact the insured's product in the sense that it was the end result of the work performed by the insured; however, the "Damage To Product" exclusion did not work to deny the insured coverage because the claimant made claims for damage to ceilings, walls, carpets and the gym floor. The court held that if the occurrence or accident causes damage to some other property than the insured's product, the insured's liability for such damage becomes the liability of the insurer under the policy. Id.; see also, Fitness Equip. Co. v. Pennsylvania Gen. Ins. Co., 493 So.2d 1337 (Ala 1985)(insurer liable for all damages except motors insured sold to seller of treadmills; "once physical damages to property other than that of the insured was found, loss profits was covered as consequential damages as well as the other consequences of having had its contract cancelled…."). As set forth in the above section, Eastdale Mall is claiming property damage to the Mall complex and the Mall parking lot, which are not "Products" of Asphalt Paving. Specifically, Eastdale Mall is claiming that due to the negligence (and wantonness) of Asphalt Paving/Tri-State, the Mall's parking lot and the

20

Mall complex, which are not Asphalt Paving's "Product", have been damaged through the physical elimination of 382 existing parking spaces, which places the Mall in default of its contracts with department stores and, thereby, diminishes the value of the entire Mall property by millions of dollars. Eastdale Mall is not claiming that the asphalt was an inferior product.

**F.    The "Damage To Impaired Property" Exclusion Does Not Apply.**

West American, consistently with its shotgun approach to denying coverage, cites to exclusion m, the "Damage to Impaired Property" exclusion, as further basis for its denial of coverage. The exclusion and applicable definitional section are as follows:

> **Damage To Impaired Property Or Property Not Physically Injured**
>
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> **(1)**    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> **(2)**    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with is terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.
>
> **"Impaired property"** means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
> a.    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> b.    You have failed to fulfill the terms of a contractor or agreement;

if such property can be restored to use by:

a.    The repair, replacement, adjustment or removal of "your product" or "your work"; or

b.    Your fulfilling the terms of the contract or agreement.

**Your product**

**a.    Means:**

**(1)**    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed by:

**(a)**    You;

**Your work**

**a.**    Means:

**(1)**    Work or operations performed by you or on your behalf, and

**(2)**    Material, parts or equipment furnished in connection with such work or operations.

**b.**    Includes:

**(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work" and

**(2)**    The providing of or failure to provide warning or instructions.

West American reliance on the "impaired property" exclusion is misplaced. Insurers, like West American, have not had success in relying on the impaired property exclusion to preclude coverage in construction defect cases. See <u>Steve Roberts Custom Builders</u>, 215 F. Supp. 2d 783, 792-93 (E.D. Tax 2002)(rejecting application of exclusion m);

<u>McKinney Builders</u>, 1999 WL 608851, at *9 (same). In <u>McKinney Builders</u>, for example, the court concluded that the impaired property exclusion is ambiguous since its application turns on whether the alleged property damage is seen as damage to impaired property or damage as a result of physical injury to property. See <u>McKinney Builders</u>, 1999 WL 608851, at *9; <u>see also</u> <u>Serigne v. Wildey</u>, 612 So.2d 155 (La. App. 1992) (holding that the impaired property exclusion is "hopelessly" ambiguous).  Clearly, West American recognizes that this exclusion is ambiguous, as it cites no case law in support of its position and, as shown above, courts have repeated said the "impaired property" exclusion is ambiguous and do not attempt to apply it.  Simply put, the "impaired property" exclusion has no application to this case.

## IV.     <u>CONCLUSION</u>

West American's Motion for Summary Judgment is due to be denied.

Respectfully submitted this 11th day of September, 2006.

/s  Donald R. Jones, Jr.
Donald R. Jones, Jr.
James E. Bridges, III
Donald R. Jones, Jr., Attorney-at-Law, P.C.
2000 Interstate Park Drive, Suite 104
Montgomery, Alabama  36109
Telephone:  (334) 277-3939
Email:  don@djoneslaw.com
Email:  pete@djoneslaw.com

**Counsel for Defendant,
 Asphalt Paving Co., Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Michael Jon Douglas**
  aperkins@friedmanleak.com mdouglas@friedmanleak.com
- **Robert David Segall**
  segall@copelandfranco.com bryan@copelandfranco.com
- **Christopher John Zulanas**
  czulanas@friedmanleak.com
  mlittle@friedmanleak.com;stacy@friedmanleak.com

/s Donald R. Jones, Jr.
OF COUNSEL